Case No. 24-1435 Krista Jones v. Interlake Steamship Company et al. Argument not to exceed 15 minutes per side. Mr. Bull, you may proceed for the appellant. Morning, Your Honors. Ellis Bull here for the appellant, plaintiff Krista Jones. Morning. All the way from Charlevoix, huh? Yes, sir. All right. I came down yesterday without a hitch. I'm coming back this afternoon. I feel a little snowy by the time you get back up there. Well, I was able to make it out of the driveway. That's the hardest part. Uh-huh. All right. Well, I think the case is pretty well briefed. I'm not going to – this is not a factual case like the one you just heard. The legal issues are prominent here, and we're dealing with a supervisor's union. There have been supervisors' unions around since the 1920s. They're not very common, but they've been there. How do we know that? Because the dissent in the Packard Motor Car v. NLRB case, which was cited only in passing in the briefs, mentioned that supervisor unions have been recognized since the 1920s. The most relevant case on that, I believe, is this Court's decision in 1977, District 2, Amoeba v. Amoco Oil, in which they recognized that supervisor unions not only exist, but sometimes they go on strike. So it's – there are not very many of them. And the one case in the Ninth Circuit, the Dante case – Pardon me. We need – Yeah, I'm trying to fix it. Are you having a problem with it? Yeah. Oh. Should I start over? No, no, no. You're fine. Oh, you're good. You haven't – oh, there we go. You're good. You just got some bonus time, basically. All right. Well, now the light's off. There it's on. Okay. All right. I'll manual it. I'm sorry. I wasn't – Don't worry. No, that's not – you're supposed to be focused on your argument. Okay. All right. It's the – Well, can I ask you a question? Yes, please. All right. So this association, you know, MIBA, they come in and eventually become the union representing the folks who work on these freighters. Yeah, the company invites them in. Right. The company recruits them in. So the company brings them in. And as I understand it, I mean, the company is insisting that the captain – and I guess the chief stewards, these more senior officers –  – be removable at will. Yes. And, I mean, why isn't it fair to read this record as that, you know, the at-will termination provision, which did – that that was just part of a larger compromise where at least, you know, according to the association, those two positions, they got some of the benefits that people generally got or the folks in the union generally got, but not all of them. And that was kind of the best they could do given the company's position. Well, if you ignore the fact that the union was recruited by the company, that the company gave the union 100 new free dues-paying members without the union having to organize them or go among them, for the company and union to agree to this without even telling the officers. The point that Judge Kepledge is raising, I think, is there's – this is a right-to-work state. And Section 14A, as I read it, expressly provides that employers can insist on excluding stewards, right, chief stewards, from the just cause protections without violating labor laws. So how could they – you're asking them to negotiate with nothing in their hand, in essence, right? Well, the union has a right to strike. Certainly, the previous union was threatening a strike, and the company was afraid of that. And just because Michigan became a right-to-work state and the two other states became right-to-work states, still they have an obligation to represent all their members fairly, even – Yeah, no, no, I understand that. Willing or not. How do you deal with Section 14A? I don't think it's an issue because the union has to represent everybody fairly whether they're required to be in the union or not. She was happy to be in the union. But even whether she was happy to be in the union or not, they still had to represent her fairly. But I think, Judge, the parse point is that since the law doesn't create a backdrop requiring that stewards be in a collective bargaining agreement, that they can be excluded by law, the union's kind of in a bad position. It has no legal backstop. So it's doing the best it can. None of the affidavits from the union witnesses stated that the reason they negotiated this had anything to do with a supervisor's union being unable to or difficult in striking. The points that you're raising were raised in the opposing briefs, but were not raised by the witness affidavits. So I think it's just speculation as to whether the right-to-work laws had anything to do with this case or not. Can I ask you about your common law torts you're trying to bring against Interlake? Yes. So I couldn't find, nor can Hart and Wexler, one case in the last 30 years that has adopted your reading of Lincoln Mills. Do you have any? And even Granite Rock says, we endorse the Court of Appeals' refusal to create federal common law. So I'm just struggling with how Lincoln Mills can be reconciled with the Supreme Court's approach now that real torts all come out of statutory interpretation, and that's where you get them, and we shouldn't be creating common law torts. Well, Alice Chalmers v. Luke repeated what Lincoln Mills said, that it's an obligation of the courts to fashion federal law, and the duty of fair representation itself was judicially created. It's not in any statute. The courts came up with that. Why? Because the unions have a fiduciary duty. No one has objected to the fact that this union had a fiduciary duty, and a fiduciary cannot make its own dealings with the employer. That's basic fiduciary law. Yeah, but that comes right out of 301, right? We're not in 301 here. No, I know, but the fiduciary responsibilities of the union itself come out of 301. No, I'm sorry, Your Honor. Whether there's 301 or not, the union still has a fiduciary duty, and this Court recognized that when it remanded the last time. But we didn't create a federal common law tort there. I know you didn't, but the fact that there was a remand the last time, even though there was no 301 case, meant that the union still had a fiduciary duty. I'm sorry to— I thought that was a statute of limitations remand. Am I wrong? There's no statute that says you have a duty of fair representation. It's a judge-made obligation by the Supreme Court. Well, I mean, as to that obligation itself, it seems like the standard by which we review a union's discharge of it is pretty deferential, you know, arbitrary. Arbitrary is, I mean, that's, you know, akin to what we do under the Administrative Procedures Act. I mean, that's, you know, that's a lot of latitude, discriminatory. It is pretty differential, but this union, and I don't see anywhere in the Interlake brief where they disagree that this Court may rely on the Wray arbitration decision. The company's not saying that you should not take that into account, not in their briefs. And this union came in under the thumb of the company. It was not a true advocate of the working class. Were there—I mean, are you aware of any other cases where that circumstance was cited? No, no. We're making history today. Okay. Yeah. All right. This has not been . . . The Dente case in the Ninth Circuit said a DFR case is tenable in the case of the supervisor union. In that case, they said there was no breach, but at least they said the claim could be made. And the Dente case was cited by this Court in the District 2 case. I mean, did the employees have any say in . . . Not in this case, they should. Any fiduciary has the right to be able to . . . Any—what's it called? The beneficiary of fiduciary has to know that so-and-so is their fiduciary, that he's the fiduciary, not him, or back and forth. Did they—I mean, were they aware that the union was leaving? No. Arbitrator Wray said that this union came in and the employee officers were not even told that the union had come in. Isn't that kind of strange? Yes, it sure is. I'm kind of—but I'm kind of incredulous that they wouldn't have known somehow. That's what the arbitrator said. Yeah, but, I mean, arbitrations. The arbitrator was . . . Having practiced—you know, nobody who's in practice . . . Arbitrator was upheld . . . Always spitting the baby. . . . by the district court. The district court upheld the arbitrator. Sure. That's uber-deferential. As long as you don't commit fraud, you're in pretty good shape. But anyway, sir, I don't mean to . . . This is what happened in 2003. The union came in under the thumb . . . Am I close to my . . . No, you're good. Well, yellow is one minute to go, and red is . . . Let me step back and let the other side go. Let me talk about the attorney's fees before you step back, because I want to understand this. So, Judge Yonker says it's ordered that $50 be paid, and then he says, pursuant to 414, it's further ordered that the plaintiff's interim request for an award of attorney's fees is denied without prejudice to plaintiff filing an appropriate motion for attorney fees upon conclusion of the remaining issues in the case. Right. That's issued in October of 2003. Then in May of 2004, he issues judgment. You had 14 days from judgment to file for attorney's fees. You didn't do so. Why are . . . Because I appealed to this court, and that deprived the lower court of . . . No, you can file for attorney fees within 14 days of judgment. I mean, appealing to this court doesn't toll your time. If the court remands any aspect of this case, which I'm hoping you will . . . But does it rise and fall then? Do you concede it rises and falls on whether we remand another aspect of this case? No, I think there was a case . . . Well, you cite in your brief, Miltimore, but Miltimore involved a Rule 59 motion, which necessarily sets aside the judgment, whereas an appeal does not. And we said in Miltimore, critically, when a Rule 59 motion is filed and finality is suspended, the judgment is neither final nor in order from which an appeal lies. And that's why there was tolling there. But filing an appeal isn't the same thing as making a 59E motion. In fact, filing an appeal is dependent on the finality of judgment. So it's the inverse. Let me answer that when I come back in a minute, because there's a case that I've cited here. I just want to take a minute to find that particular case. That's no problem at all, sir. All right, you'll have your rebuttal. And I think, for your record, the case is Miltimore. That's what I saw cited in your brief. There's another case I have in mind, but let's . . . Good morning, Your Honors. I'm one of these gentlemen. My name is Paul Starr. May it please the Court, I represent Arena Engineers Beneficial Association. And I'm going to take up the bulk of our time. Yeah, I see you. It's 10 and 5. Yes. So, Your Honors, the amended complaint in this case is the operative pleading. And there, in terms of the, what I call the stand-alone DFR breach claim, that is the union's negotiation of the 2003 side letter, which was materially the same as the 2013 side letter, also negotiated. There's no allegation of discriminatory conduct in that pleading. There is also no allegation of bad faith conduct in negotiating those agreements. This is what? Which pleading? In the amended complaint. That's the operative pleading. That's ECF-28. So, in other words, two of the three grounds on which we could say there was a breach are not pled, is what you're saying? That's exactly what I'm saying, Your Honor. Okay. Thank you. Simply at issue is whether the union's conduct in negotiating the side letter was arbitrary. That's all you have. And you also have, with respect to, you know, a review on summary judgment, you have no disputes of fact in terms of what the union did in negotiating the agreement. The union put forth in its summary judgment motion five affidavits from both management representatives and union representatives who negotiated the 2003 side letter and the materially identical 2013 side letter. There were no countering affidavits. 2003 is before you're representing these folks. Is that right? Is that when you come in? That's when Amoeba came in, in July of 2003. What was the status quo before then? I mean, is that part of the record? Was this a change, in other words, with respect to the at-will provision for these positions? Yeah. I believe in the record the collective bargaining agreement between Interlake and the prior union, the American Maritime Officers, the AMO, did have just cause language in it, in the agreement that covered Chief Stewart. Isn't that relevant to determining the reasonableness of the new contract? I mean, the fact that they were able to get these benefits for the workers under the other union was able to do that? Respectfully, I don't think it matters.  Because this is a different union. Yes, I think that's his point. No, you go to the bargaining table, and who knows what the positions of the parties will be? Who knows what Interlake will want, will agree to, will reject? They wanted MEBA because they wanted a different framework. They thought it was in the best interest of their employees to have a different union in place of AMO. And, again, this was stated earlier in the argument, you have to understand the legal landscape here in which MEBA was negotiating. It had no leverage because this is somewhat anomalous, a supervisory union. And the NLRA says there can be supervisory unions, but it's completely voluntary from the employer's perspective. The employer can walk away at any time. It could have said to MEBA, you know, we want all of these other carve-outs. We want this, we want that. And there's no unfair labor practice charge that MEBA could file with the NLRB because there's no duty to bargain in good faith for a supervisory union on the employer's part. Well, I mean, that's a fair point, but back to Judge Larson's point, I mean, the other unions somehow managed to get just cause protections for these provisions. And, you know, why isn't that sort of prima facie? It seemed like that was a possibility here. I mean, somehow they had the leverage or whatever to wherewithal to make that happen. And good for them, except it doesn't matter as a matter of law because MEBA, of course, MEBA would not go and say, we don't want just cause protection for captains or chief stewards to act with them. There's no evidence of that. In fact, the MEBA or the interlakes position initially was we don't want these two classifications in the unit at all. And what the record shows, and it's uncontradicted, is that MEBA negotiated those two classifications to be in the unit. And the primary driving force in terms of rationale was the MEBA has a number of benefit funds, including a pension fund. And this, including those two classifications in the unit, would allow these two classifications to participate in what were uncontradicted, at least stated in affidavits as lucrative, healthy pension and other benefit funds. So that I mean, that is a significant benefit as compared to just being on the outside. Right. And again, paying in, you know, six percent or whatever. But I mean, that's a fair point. Right. And wrap this around the fact that the legal standard of arbitrariness in negotiating a contract, this goes back to the O'Neill case. That's what that's what governs this case. That's the Supreme Court's decision in the Airline Pilots Association versus O'Neill. If I can quote, a union's actions are arbitrary only if in light of the factual and legal landscape. Remember, the legal landscape here is no duty to bargain by interlake. The factual and legal landscape at the time of the union's actions, the behavior is so far outside a wide range of reasonableness as to be irrational. So the standards, they define arbitrary as irrational. I think there's nothing in the record to which you can point to conclude that the negotiation of this agreement with the carve-outs for the chief steward, with the carve-outs for the captains, reached the level of irrational. So I guess I'm not adopting, I'm just trying to summarize your points here so that I make sure I'm understanding them. Your position is, hey, Interlake had no obligation, even to bargain with us, about any representation or benefits for these positions. We managed to get some of the benefits. We managed to get Interlake to agree that these folks would be part of the association, and they get the pension and they have some other benefits. We couldn't get the other thing, but that's not irrational. That's exactly right. I think that's exactly right. The demanding standard is, you know, you mentioned earlier, absent fraud and arbitrators, the decision is not going to be overturned. I think it's close to that. What does she get from the union? I mean, she pays dues, right? Well, she paid dues. She didn't have to pay dues, because she was working in right-to-work states, Michigan, Wisconsin, and Indiana, sailing on the Great Lakes. Right, so what does she get in exchange for paying dues if you guys don't get her protections? She got to participate in the pension fund, which, you know, these days, there is no, this is a defined benefit pension plan. This is not a defined contribution 401k. Oh, yeah. I mean, they're valuable. They're dinosaurs, but in the union setting, they still exist. But she would still get those if she didn't pay dues. The paying dues has nothing to do with whether she gets the benefits. Oh, correct. She's still a member of the bargaining unit. She's still owed the duty of fair representation by the union, whether or not she pays dues. And I suppose she gets to, by being a member, she gets to participate in some decision-making? She can vote to ratify the collective bargaining agreement that covers her employment. She could run for office, et cetera. There are a number of benefits that are exclusive to members versus non-members. It seems like, I mean, she missed the boat, right, for getting a clock for the boat. I mean, that seems, it seems pretty draconian to fire her for that. I can't speak to that. I don't represent the employer. Judge Kavlich disagrees with that. But to your point, Your Honor, even though there was no just cause protection, a representative, Jason Callahan, went from, I think he's based in Boston, out to the Great Lakes to see what he could find and see if he could compel the employer or find reason to compel the employer to bring her back. Notwithstanding that he was going into a gunfight with a nail clipper. He had nothing to work with. But, no, they did take action in that regard. Where was this port? Was this Sault Ste. Marie? I believe it sailed from Superior, Wisconsin, north of the Sulox, and came down through the Sulox and ended up at a port in Indiana. Okay. And I see my time is up. Thank you. Not quite, but that's all right. All right. Thank you, Mr. Starr. That was helpful. We'll hear from Mr. Tersigni, if I'm saying it right. Good morning, Your Honors, and may it please the Court. I am Vincent Tersigni. I'm counsel for the Interlake Steamship Company. I have five minutes to state my case. Thank you very much for the opportunity. This argument on behalf of Interlake is a little bit different than the others in that this has already been before the Court. There was a hybrid 301 action brought by Jones against Interlake and the union. We filed a motion to dismiss in the district court. It was appealed. The Sixth Circuit affirmed the decision in favor of Interlake Steamship did remand an issue regarding the union on their DFR claim. The Court found that since Jones was employed at will under the union contract, based on the contract she was trying to assert was breached, there was no breach of the agreement. No breach of the union's duty to represent. Correct, as well, because you have to have both. On remand, plaintiff tried to repackage her claims in calling it. She amended her complaint multiple times, and finally in her proposed third amended complaint, as noted by the district court, she tried to repackage the hybrid 301 action as an aiding and abetting the DFR violation of the union on remand, and she sought leave to do that in addition to asserting a tortious interference claim under, I guess, a federal common law that they were trying to carve out. The district court properly recognized that by the law of the case doctrine they couldn't continue to bring these claims against Interlake, which were already decided by this court. Additionally, the court was not going to carve a new federal common law, inconsistent with Granite Rock from the Supreme Court, which clearly stated that the court's not in the business to do that. So Judge Yonker denies the motion to amend. So Judge Yonker denied the motion to amend the complaint under Rule 15, and we respectfully assert that that was done properly. We would assert that an abuse of discretion standard should be applied to that under Rule 15 and that the judge found that there certainly would be prejudice to the Interlake Steamship Company by bringing it back into a case. We've never even filed an answer in this case. Was there any reason why the plaintiff could not have included those claims such as they were in the first complaint that was filed? Sure, they could have tried the first time. These things didn't become a possibility only as a consequence, say. Appellant's counsel, I believe, argued in their briefs that they discovered this raid decision and they discovered or they found or got an affidavit. This is all after the fact, information that they could have, with due diligence, discovered beforehand and brought it in their initial case, which they neglected to do. Instead, they just, well, that didn't work, so let me try something else, at the district court, based on the exact same set of facts. At the end of the day, this is a case where, as you mentioned, the plaintiff missed the boat. Where was that? I'm just curious. I mean, you know, if it's like the last port for a while, I don't know, it's almost idle. I'm sorry. What port was it where she failed to come to the ship in time? I'm forgetting that fact.  I apologize. It's fine. But she left the ship prior to the departure time, and the ship didn't even leave for almost an hour after its scheduled departure time. Ironically, she went to buy a clock. She's standing there with her clock and the ship's taking off, and she calls her supervisor and they say that she missed the boat, and they say, well, get a hotel and we'll take care of it and we'll talk about it. She disregarded that and she tried to follow the ship, but she had other performance issues. So in reference to your discussion about was that harsh to just terminate her from missing the ship. Well, it's a big deal when your person who's responsible for cooking your food on the ship misses it. What's the difference? I mean, she at that time was a chief steward, right? What are the responsibilities of that job as compared to the cook? Well, she was in charge of the whole kitchen operation. Like the head of the kitchen? Yes, the head cook, I guess you would say, supervisor responsibilities. How big was this freighter, 900, 1,000? It's a big ship. It's a big iron ore ship. All right, well. So for these reasons, we respectfully assert that it's a straightforward issue here. Did the district court err by declining plaintiff the opportunity? Sure, or abuse of discretion, more the point, right? We would respectfully assert that it was not. And as the facts have played out, obviously Meeba obtained summary judgment as well as to the DFR claim. So there was no violation of the duty of fair representation for interleague to even aid and abet or interfere with. They're simply, as the union has testified or argued, there was no DFR violation at all by the union. So it was appropriate for the court to. Do you have anything to say about the, you know. Mr. Elias suggests that there's sort of a hint of wrongdoing about interleague seeking out this particular union. Do you have anything to say about that? Sure. From what I understand happened, and I wasn't part of discovery because we were out of the case, right? But the positions I think that were submitted in the case and the affidavits, I believe that the business agent for the AMO left and went to the Meeba union as a consultant, and therefore there was a continuing relationship, and they started talking, which led to Meeba becoming the new bargaining representative for the employer's ownership. Okay. I'm sorry. It's Mr. Bohl. I apologize. I'm trying. All right, sir. Thank you very much. All right. Thank you for your argument. We'll hear a rebuttal. I have so many things to say. I'm not sure I can get it done. Judge Thapar, in response to your question about the attorney fees, I direct you to the case of Freed, F-R-E-E-D v. Thomas, 81. You cited that in your brief. I'm familiar with that. That cites J.P. Morgan Chase. You should read J.P. Morgan Chase because that case explains that the way to seek fees is within 14 days of judgment, you file it, then Rule 58 allows the district court, I know this from being a district judge, to toll the time for appeal if you want. Similarly, even if they don't, we, in J.P. Morgan Chase, following the Supreme Court and other circuits lead, have treated judge fees provisions as independent such that you can appeal them when done and final. And so the problem here is you appealed but didn't file Rule 54 or Rule 58 in seeking a time to, you didn't file within 14 days and then seek a tolling of the appeal. So I think the fees, unfortunately, rise or fall with the rest of your litigation. I'm not familiar with the J.P. Morgan Chase case you're referring to. And if I may have five days to write a supplemental brief addressing that. I don't think that's necessary, sir. All right, fine. I don't think we want to reopen. That's fine. Let's go on to something else. It was not an arm's length deal between MEBA and Interlake. So I think that just cuts the legs out of. Well, what's the basis for that? Because Interlake brought the union in without even tolling the affected members and made them a gift of 100 new dues-paying members. So about the lucrative benefits, there's no evidence in the record about how lucrative the benefits were to the chief stewards or cooks. Well, I mean, you don't dispute that they could participate in the pension plan, right? Yes, but there's no evidence about the nature of that pension plan, how good it was, how good it was compared to the AMO pension plan, whether these benefits were lucrative. There's just a claim that they were lucrative, but there's no evidence about whether they actually were lucrative. I mean, a pension plan is something. What about the fact that Interlake didn't even have a duty to bargain in good faith as to these positions? I mean, Interlake, under the relevant act, did not have a duty of good faith to bargain with the union as to these positions. They could have said, you know what, it's a non-starter. Those people are not going to be represented. And that's what should have happened. Amoeba should have walked away and left the officers with their previous union, AMO, American Maritime Officers. That would have been the correct solution. Because they did have, excuse me, Your Honor, when that new contract was signed, there was still a week to go on the old union contract with AMO. And it was a violation for Interlake to even be talking to Amoeba when there was still a week to go under the old AMO contract. And that's in the record. That's in the Wray decision. And I don't see that the company here is arguing that you should ignore the Wray decision. The Wray decision is in due diligence. She's not a union activist. She's not a person expected to be diligent in those kinds of things. She was a cook for eight years. She did a good job for eight years. We did not know about the Wray decision until years later. But when we found out, we found out that it predated the events of this case. Okay. Do you want to wrap up in 30 seconds here? Yes. Now we're in the red light, which means time is expired. It was a 1,000-foot boat. All right. Thanks. I was just curious. Okay. I spent a lot of time out on the Great Lakes, so I've seen a lot of craters go by. I have, too. Repackaging. It's not repackaging because we're proceeding not under 301, but under the duty of fair representation. That's a separate claim. Yes, we're asking for the same relief. We understand that. Okay. I thought you would. I'll stop there. Thanks. All right, sir. Well, we thank you all for your arguments. The case will be submitted.